## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD SLIWINSKI and PZEMYSLAW JEDNAKI,<br>    *Plaintiffs*,<br><br>    v.<br><br>CHARLES BURNS, PAUL GUNN, PAUL PEDERSON, CHRISTOPHER REID, LARRY MORELLO, STATE TROOPERS DOE 1-4, MIDDLETOWN POLICE OFFICERS DOE 1-7, and THE CITY OF MIDDLETOWN,<br>    *Defendants*. | No. 3:14-cv-00442 (JAM) |

## ORDER RE MOTIONS FOR SUMMARY JUDGMENT

One night in April 2012, a masked man robbed a convenience store at gunpoint in the otherwise sleepy town of Haddam, Connecticut. The police thought they had tracked the robber's getaway car to perhaps the unlikeliest of places—the rectory of a Catholic church in nearby Middletown, Connecticut. But the police were ultimately proved wrong: they were misled by a putative witness's errant description of the getaway car. Unfortunately, before the police realized the error, they had entered the rectory without consent, handcuffed two priests there, and searched through much of the premises.

The two priests have now sued the police, contending in principal part that the police violated their constitutional rights to be free from unreasonable search and seizure. The defendants have now moved for summary judgment. I will grant their motions in large part, except as to one of the officers. As to that one officer, I conclude that genuine issues of fact remain for trial with respect to his initial entry into the rectory and his search of one of the priest's cars.

**BACKGROUND**

The following facts are undisputed or, if disputed, are stated in the light most favorable to plaintiffs. Plaintiffs are two Catholic priests—Fathers Richard Sliwinski and Pzemyslaw Jednaki. Defendants are officers of the Connecticut State Police, including Sergeant Charles Burns and Troopers Paul Gunn, Christopher Reid, Paul Pederson, and Larry Morello.[1]

On April 16, 2012, someone robbed a gas station at Jasper's General Store in Haddam, Connecticut. Trooper Christopher Reid was the first to arrive on the scene and questioned the gas station attendant who described the suspect as a male with a black ski mask and gloves, and that he brandished a black handgun during the robbery. The suspect allegedly fled in a car toward Middletown, Connecticut.

Reid then questioned another bystander, who said that he heard yelling at the store, went to investigate, and was told by the attendant about the robbery. The bystander said that he saw the getaway car and that he ran to his own car to give chase. He saw the car run a red light and weave in and out of traffic while travelling at a high speed, and then turn into a post office parking lot. According to the bystander, the getaway car was a Honda CRV, and he identified the license plate number.

Reid passed on this information to the dispatcher, who broadcast it to Trooper Paul Gunn and other responding officers. Sergeant Charles Burns and another trooper then arrived on the scene and spoke to the attendant and the bystander who had identified and followed the getaway car. Both the attendant and the bystander gave written statements to the police. According to the attendant, he saw a dark-colored vehicle drive off quickly after the robber left the store, and he

---

[1] The complaint also names several "Doe" defendants from the Connecticut State Police and the City of Middletown police department as well as the City of Middletown. Plaintiffs abandoned their claims against these defendants at oral argument, and therefore I will dismiss all claims against these defendants.

believed it to be the getaway car, driven by a second person. He said the robber was skinny and about 5'5" tall.

A trooper ran a license plate search for the plate number that the bystander had provided. The plate number came back as a Honda CRV, which matched the make-and-model furnished by the bystander for the getaway car. The registration address associated with the suspect car was the rectory at Saint Mary of Czestochowa Church in Middletown. Sliwinski was the pastor of the St. Mary's church and lived at the church's rectory.

Gunn drove to the rectory, where some local police from Middletown were already on the scene. A Middletown officer told Gunn they had knocked on the door to the rectory, but that no one had answered. Gunn left to pursue another possible lead, and when he returned to the rectory no other police officers were there.

Gunn decided to investigate further at the rectory. He did not see any sign of the putative getaway car. Nor did he then believe that any priests who might live at the rectory were likely robbery suspects; instead, he suspected that their car could have been stolen for use in the robbery.

Gunn searched for an entryway into the rectory. He walked down a pathway next to a garage and came upon a stone wall with a metal door in it. He knocked on the door and, receiving no answer, opened it and walked through. It led to an enclosed stairwell that he walked down and into a courtyard area. There he saw a man—who turned out to be plaintiff Pzemyslaw Jednaki—sitting and working at a laptop computer, apparently unaware that Gunn was there.

Instead of identifying himself to Jednaki, Gunn entered through an unlocked door that adjoined the courtyard into a kitchen, apparently without knocking. Inside the kitchen was Sliwinski who was scaling a fish with a knife. Gunn told Sliwinksi to put away the knife, and

Sliwinski put down the knife and greeted Gunn, shaking his hand. Sliwinski told him he was the priest at Saint Mary's church.

Without explaining why he was at the rectory, Gunn asked Sliwinski where his car was, and Sliwinski told him it was in the adjoining garage. Gunn instructed Sliwinski to give him his keys and show him the car. Gunn entered the garage, followed by Sliwinksi, and upon seeing that the license plate matched that of the reported getaway car, he handcuffed Sliwinski. When Sliwinski asked what he had done wrong, Gunn replied, "You will find out later." Doc. #56 at 14. Gunn then asked Jednaki to identify himself, and when Jednaki said his wallet with his identification was in his car, Gunn told him to stay where he was.

Gunn then explained to Sliwinski that he was investigating an incident that had occurred in Haddam. Sliwinski said that no one had borrowed his vehicle and that he had been in Haddam earlier that day fishing and at another's priest's home.

Gunn then searched Sliwinski's car. Sliwinski did not consent to the search of his car. As he did throughout the encounter, Sliwinski did not protest the search because he was confused and scared. For his part, Gunn claims that he handcuffed Sliwinski because he had now become a suspect in an armed robbery and he did not think it prudent to search the car with the suspect unsecured.

Gunn found nothing of evidentiary value in the car. At around this time, according to Gunn, it "became more and more evident that the information [the police] had been given was likely faulty." Doc. #56 at 19.

Back in the house, Gunn questioned Sliwinski further. Sliwinski said that he had never stopped at a gas station. He said he had not run any red lights, but may have been speeding a bit, and that he accidentally turned into the Post Office driveway on his way home. His description

4

of his driving route matched the bystander's description of the route that had been followed by the putative getaway car.

At this time, Trooper Paul Pederson and several Middletown police officers arrived at the rectory. Gunn instructed one of the newly arrived officers to bring Jednaki up from the courtyard. Jednaki was not handcuffed, because Gunn did not have a second set of handcuffs.

A trooper—either Gunn or Pederson—then began questioning Jednaki who stated that he had been in Middletown earlier in the day for between two and four hours, and he had at some point stopped at a gas station for cigarettes. At this point the interrogating trooper—whether it was Gunn or Pederson—"became agitated" and patted down Jednaki's clothing and, finding no weapons, handcuffed him. Doc. #56 at 19.

The trooper who handcuffed him asked Jednaki for permission to search the rectory, and Jednaki replied that it was not his house, and he could not give permission. The trooper then instructed Jednaki to stand facing the shed and not to move. Leaving an officer to watch Jednaki, the trooper returned to Sliwinski in the garage.

At some point, Gunn contacted his supervisor, Sergeant Burns, to inform him that the situation did not seem to match the bystander's report. Burns then asked Reid to re-interview the bystander, and this re-interview gave reason for more doubt. It became clear through this re-interview that the bystander had not actually seen the robbery suspect enter the getaway car, and that there was a period of time when he lost sight of the apparent getaway car. While trying to pursue the getaway car, the bystander had seen several sets of taillights at a red light, and had merely followed the set that ran the red light.

Burns told Gunn that he should search the rectory for any evidence of the robbery. According to Sliwinski, Gunn said "we have to search the house also," but didn't explain why

5

beyond stating that his superiors would be asking about "the details." Doc. #68-4 at 35. Sliwinski did not say that he would either permit or not permit the search. He said, "I don't have nothing to hide." Doc. #86-4 at 35. Sliwinski then accompanied the troopers as they searched his home. They discovered a bag containing ski equipment, including a mask and gloves. Suspecting these items could be related to the robbery, the troopers took them. The gas station attendant later confirmed that the mask was not the mask used by the robber.

At the troopers' request, Sliwinski dictated a written statement and signed it. The troopers and officers then left the rectory without making an arrest or initiating any charges against either Sliwinski or Jednaki.

Plaintiffs have filed this lawsuit against the defendants. Count One alleges that the defendants subjected the plaintiffs to false arrest and unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Count Two alleges that the defendants subjected plaintiffs to intentional infliction of emotional distress in violation of state law. Defendants have now moved for summary judgment.

### DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Gr., LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-

moving party and with all ambiguities and reasonable inferences drawn against the moving party.
*See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d
Cir. 2013). All in all, "a judge's function at summary judgment is not to weigh the evidence and
determine the truth of the matter but to determine whether there is a genuine issue for trial."
*Tolan*, 134 S. Ct. at 1866.

The Fourth Amendment protects the rights of the people "to be secure in their persons,
houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., amend.
IV. The Fourth Amendment limits both searches and seizures. A "search" for purposes of the
Fourth Amendment occurs either when the police intrude upon a person's reasonable expectation
of privacy or, alternatively, if the police otherwise trespass upon a suspect's person, house,
papers, or effects for the purpose of acquiring information. *See Florida v. Jardines*, 133 S. Ct.
1409, 1414 (2013); *United States v. Jones*, 132 S. Ct. 945, 951 n.5 (2012).[2] A "seizure" of a
person under the Fourth Amendment occurs when the police intentionally terminate one's
freedom of movement by means of physical force or by show of their official law enforcement
authority. *See Brendlin v. California*, 551 U.S. 249, 254 (2007); *Russo v. City of Bridgeport*, 479
F.3d 196, 208 (2d Cir. 2007).

It is well established that "physical entry of the home is the chief evil against which the
wording of the Fourth Amendment is directed." *United States v. United States District Court*,
407 U.S. 297, 313 (1972). Indeed, "[t]he core premise underlying the Fourth Amendment is that
warrantless searches of a home are presumptively unreasonable." *Harris v. O'Hare*, 770 F.3d

---

[2] In *Jones*, which was a decision that issued several months before the events at issue in this case, the
Supreme Court expanded the traditional understanding of the Fourth Amendment to make clear that whether a
Fourth Amendment "search" has occurred may depend not only on whether a person has a legitimate expectation of
privacy in the area searched but also on whether the police have otherwise engaged in a trespass on the person,
home, papers, or a person's effects for the purpose of acquiring information. *See generally United States v. Sweeney*,
821 F.3d 893, 899-903 (7th Cir. 2016).

224, 231 (2d Cir. 2014) (citing, *inter alia*, *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011)). If police officers have neither a warrant nor valid consent, they need no less than both probable cause and exigent circumstances in order to lawfully enter or to remain in a person's home. *Ibid.* (citing *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (*per curiam*)); *Fernandez v. California*, 134 S. Ct. 1126, 1132 (2014). A homeowner and any overnight guest have a reasonable expectation of privacy within the home. *See, e.g., Minnesota v. Olson*, 495 U.S. 91 (1990).

In this manner, police violation of the Fourth Amendment justifies an award of money damages in a civil lawsuit like this one. That is because the doctrine of qualified immunity protects police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The Supreme Court has explained that "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).

In this manner, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014). It follows that a police officer is entitled to qualified immunity if "(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 263 (2d Cir. 2015); *see also Amore v. Novarro*, 624 F.3d 522, 529-30 (2d Cir. 2010).

In light of this legal background, I now turn to consider whether a genuine issue of fact exists to allow for potential liability against any of the police officer defendants for a violation of

the Fourth Amendment. I will focus my inquiry largely on whether the police defendants are entitled to qualified immunity in connection with the entry into the rectory and the subsequent handcuffing of Sliwinski and Jednaki and the search of the car and the rectory.

### Entry into the Rectory

Defendants do not contest for purposes of summary judgment that Trooper Gunn entered the interior of the rectory without consent and without exigent circumstances to justify a nonconsensual and warrantless entry. Indeed, Gunn testified that, when he entered the home, he believed the car had been stolen and did not consider that Sliwinski had committed the crime. Doc. #55-2 at 4. In any event, regardless of Gunn's subjective beliefs about whether the perpetrators of the robbery were inside the house, no objectively reasonable officer would have believed on the basis of the facts as known to Gunn that he could enter a home without a warrant simply because that home was the address listed for the registration of a vehicle that was believed to have been used for purposes of a robbery. The law was clearly established at the time that a police officer may not enter a private individual's home without a warrant unless the police officer has consent or unless there are exigent circumstances to justify entry. *See, e.g, Kentucky v. King,* 563 U.S. 452, 460 (2011); *Payton v. New York*, 445 U.S. 573, 588 (1980); *see also Stancuna v. Sherman*, 563 F. Supp. 2d 349, 356-57 (D. Conn. 2008) (officer not entitled to qualified immunity because it was clearly established that he needed warrant or exigent circumstances to enter private garage).

Defendants misplace their reliance on *Carroll v. Carman*, 135 S. Ct. 348 (2014) (*per curiam*), a case in which the Supreme Court held that officers who went through a person's yard and up to her back door in order to speak with a person did not violate clearly established law and thus were entitled to qualified immunity. *See id.* at 352. In contrast to *Carroll*, the primary

issue here is not whether Gunn was permitted to walk *up to* the door of the rectory, but whether he was permitted to *enter* the inside of the home without a warrant, consent or exigent circumstances.

Crediting Sliwinski's deposition testimony, as I must for purposes of summary judgment, Gunn not only trespassed inside Sliwinski's home but both Sliwinski and Jednaki (as an overnight guest) also had a reasonable expectation of privacy within the rectory. According to Sliwinski, visitors to the rectory had to enter by the front door, which led to the church offices. The door Gunn entered, in contrast was Silwinski's "private door," which only he and his friends were allowed to use. Doc. #68-4 at 30.[3] Defendants' counsel did not contest at oral argument that plaintiffs had a protectable Fourth Amendment interest against entry by the police into the rectory. Defendants' summary judgment motion and memorandum did not address at all the lawfulness of Gunn's initial entry into the rectory. Docs. #55, #57.

Based on the facts as now developed for summary judgment purposes and viewed in the light most favorable to plaintiffs, an objectively reasonable law enforcement officer would not have believed that he could enter the rectory as he did without consent or exigent circumstances. On the basis of a fuller record that may be developed at trial, Gunn may still be entitled to qualified immunity if he can establish such facts to show that an objectively reasonable law enforcement officer could have believed that he had implied consent to enter the rectory, that exigent circumstances existed, or that the areas that he entered were open to the public and not subject to a claim by plaintiffs of trespass or a reasonable expectation of privacy.

---

[3] Jednaki's testimony creates some confusion about whether the rectory kitchen is a common area or private to Silwinski. He stated that the right side of the rectory, which includes the kitchen, was "kind of like living space for Father Richard," but also stated that it was only the second floor that was "strictly reserved just [for] the priests to use" and where Silwinski had his private rooms. Doc. #55-10 at 80. Viewing the facts in the light most favorable to plaintiffs, I nonetheless conclude from these facts that Silwinski had a legitimate expectation of privacy in the kitchen.

In view that a genuine issue of fact remains about whether Gunn's entry into the rectory was lawful and whether Gunn is entitled to qualified immunity for such entry, I likewise conclude that a genuine issue of fact remains concerning plaintiffs' entitlement to damages for each of the subsequent investigative steps by Gunn that immediately followed and that proximately and directly occurred only because Gunn unlawfully entered the rectory. *See, e.g., Townes v. City of New York*, 176 F.3d 138, 145-48 (2d Cir. 1999) (rejecting application of the fruit-of-the-poisonous-tree doctrine to § 1983 civil actions but applying rule of proximate causation to allow for plaintiff's recovery of damages proximately caused by initial illegality and without independent and intervening cause). Here, unlike in *Townes*, plaintiffs do not seek damages for any later conviction and imprisonment (they were neither formally arrested nor jailed); their damages claims are limited to harm sustained at the very time that Gunn acted against them in the rectory. Accordingly, in view that there is at least a genuine issue of fact with respect to the fact of and scope of Gunn's liability for his initial entry, I need not consider and resolve at this time whether each of his subsequent investigative steps were themselves independently lawful or would otherwise be subject to a claim of qualified immunity if viewed in isolation from his initially unlawful entry into the rectory. Accordingly, I will deny summary judgment as to the constitutional claim by plaintiffs against Trooper Gunn.[4]

In the alternative, even if I were to examine individually each of the police's challenged investigative activities while they were in the rectory (and apart from the initial unlawfulness of Gunn's presence in the rectory), I would conclude for reasons explained below that for at least one of those additional activities (the search of Sliwinski's car) a genuine issue of fact remains to

---

[4] Because the motion for summary judgment by the Connecticut State Police defendants does not address plaintiffs' state law claim for intentional infliction of emotional distress, this claim also remains for trial as to defendant Gunn in light of my conclusion that genuine issues remain concerning the constitutionality of his conduct.

show a violation of the Fourth Amendment by Gunn and to defeat qualified immunity. By contrast, I would otherwise conclude that Gunn and Pederson are entitled to qualified immunity with respect to the additional investigative activities (the handcuffing of Sliwinski and Jednaki, as well as the search of Sliwinski's living quarters). I will now address each of these investigative activities, while emphasizing as noted above that my conclusions concerning the lawfulness and application of qualified immunity as to each of these activities *when considered in isolation* from the circumstances of Gunn's entry to the rectory does not vitiate my prior conclusion concerning the basis for and scope of potential liability of Gunn for his entry into the rectory.

### *Search of Sliwinski's Car*

A genuine issue of fact remains concerning whether Sliwinski voluntarily consented to Gunn's search of his car. Sliwinski testified in his deposition that he did not consent to the search of his car but that Gunn insisted that Sliwinski give him the keys to his car so that it could be searched. Silwinski testified: "[Gunn said,] Where is your car? My car is in the garage. Give me your keys. So it wasn't a request. I would like to mention this, underline this, he never asked me. He was just ordering me, give me your keys. I gave my keys to him, he took it. . ." Doc. #68-4 at 92. When a police officer orders an individual to produce his car keys for a search, mere compliance with that order cannot even arguably be construed as consent. *See, e g., United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) ("mere acquiescence in a show of authority" does not constitute consent for Fourth Amendment purposes).

It is true that Jednaki's description of this encounter greatly undermines Sliwinski's account. Jednaki testified:

> A . . . . And again, the question of him was, what do you drive? What car do you have? Father Richard said that he has a Honda CRV. So,

> he ask[ed] him is it okay if we take a look at it, or where is the car?
> Father Richard said it's in the garage. So, he ask is it okay if I go
> and, something similar to that, to look at the car. And Father Richard
> said yes.
> . . . .
> Q. And he did ask Father Richard, can we look at the car, and Father
> Richard said yes?
> A. Or similar words.
> Q. Or words to that effect?
> A. Yes. That's what happened.

Doc. #55-10 at 100. Although Jednaki's account could prove very damaging to Sliwinski's account at trial, this conflict in testimony among co-plaintiffs does not eliminate the existence of a genuine issue of fact.

Defendants misplace their reliance on *Scott v. Harris*, 550 U.S. 372 (2007), in which the Supreme Court concluded that a trial court for summary judgment purposes may credit video evidence that "blatantly contradicted" oral testimony of what happened during a car chase. *Id.* at 378-81. When courts apply this principle to discount a party's sworn testimony at summary judgment, they tend to do so on the basis of photographic or video evidence, or uncontested official records. *See, e.g.*, *Bartels v. Schwarz*, __ Fed App'x __, 2016 WL 1055374, at *2 (2d Cir. 2016) (photographs); *Vega v. Rell*, 611 F. App'x 22, 26 (2d Cir. 2015) (uncontested medical records); *McKinney v. Dzurenda*, 555 F. App'x 110, 110 (2d Cir. 2014) (video).

Similarly, if a plaintiff contradicts himself, a court may consider that as a factor in assessing the sufficiency of evidence for summary judgment purposes. *See Harwe v. Floyd*, 545 F. App'x 20, 22 (2d Cir. 2013). Likewise, if a plaintiff's case relies entirely on a plaintiff's self-serving statements that are flatly inconsistent with his previous testimony, a court may properly grant summary judgment for a defendant. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005); *Mack v. United States*, 814 F.2d 120, 124–25 (2d Cir. 1987) (party may not

create triable issue of fact by offering an affidavit that contradicts earlier sworn testimony in the case).

The situation presented here is different than the examples cited above. While Jednaki's testimony will undoubtedly undermine Sliwinski's claim at trial, Sliwinski's testimony is not so blatantly false or self-contradictory in any respect that no reasonable jury could accept his version of events. A reasonable jury could, for example, conclude that Sliwinski had a clearer memory of what happened than Jednaki, or that Jednaki simply misheard Gunn's statements. My task at summary judgment is not to resolve credibility conflicts between different witnesses. Accordingly, in light of Sliwinski's account, summary judgment cannot be granted for Gunn with respect to Sliwinki's claim that Gunn unlawfully searched his car. Moreover, for qualified immunity purposes, no objectively reasonable law enforcement officer would conclude that—in accordance with Sliwinski's account of his lack of consent to the search of his car—that it would have been lawful for the officer to search Sliwinski's car.[5]

### Temporary Handcuffing of Sliwinski and Jednaki

Sliwinski next alleges that he was seized in violation of the Fourth Amendment when Gunn handcuffed him during the car search, and left him restrained for 45-50 minutes. When Gunn handcuffed Sliwinski, the two of them were alone in the garage. Once Gunn saw that Sliwinski's car was in the garage—and therefore had not been stolen, as he had previously thought—Gunn could have reasonably thought that Sliwinski had participated in the robbery. Gunn was told that someone, who left in this car, had robbed the gas station at gunpoint, and no gun had yet been recovered. Under these circumstances—which had changed significantly from

---

[5] Although a car may be subject to warrantless search if a police officer has probable cause to believe that the car contains contraband, *see, e.g., California v. Acevedo*, 500 U.S. 565 (1991), defendants have not contended that probable cause (or arguable probable cause) existed to search the interior of the car, and any such argument has therefore been waived for purposes of summary judgment.

when Gunn first arrived at the rectory, believing the car had been stolen—Gunn could have reasonably concluded that a temporary investigative detention was necessary to ensure his own safety while conducting the search. *See Kennedy v. McKiernan*, 2009 WL 2514067, at *4 (D. Conn. 2009) (handcuffing may be permissible during a *Terry* stop "to ensure the safety" of the officers).

Similar considerations lead to the conclusion that handcuffing Jednaki by either Gunn or Pederson was also permissible. The troopers had been informed that two people had been involved in the armed robbery, and the gun had yet to be located. Jednaki then acknowledged stopping at a gas station earlier in the day for cigarettes. A reasonable officer could have believed that the brief use of handcuffs was necessary to ensure the officers' safety.

Nor would an objectively reasonable police officer have believed that the length of the detention—as much as 50 minutes for Sliwinski, and significantly less time for Jednaki—was unconstitutional. As I have previously discussed in other rulings, in cases where law enforcement officers have conducted their investigations without needless delay, numerous courts have found investigative detentions of fairly substantial length—anywhere from thirty minutes to nearly three hours—to be constitutionally reasonable. *See, e.g.*, *Ozga v. Elliot*, 150 F. Supp. 3d 178 (D. Conn. 2015); *Crismale v. Reilly*, 2014 WL 3738151, at *4 (D. Conn. 2014) (collecting cases).

Here, there was no needless investigative delay. The scene of the crime was located miles away, and the officers were communicating frequently to develop a better understanding of the situation. Officers at both the rectory and at the robbery scene were taking witness statements, searching for evidence, and relaying information to each other throughout. Once Gunn and the other troopers uncovered inconsistencies between the witness' account and the facts, they quickly followed up with him. When it became clear that there were holes in the bystander's

15

account and that the Honda CRV was likely not the getaway car, plaintiffs were released promptly. Nothing here suggests that the troopers acted with a lack of urgency or diligence. Therefore, Gunn and Pederson are entitled to qualified immunity for handcuffing plaintiffs to the extent that plaintiffs premise liability against them solely and independently on the basis of handcuffing.[6]

### *Search of Sliwinski's Living Quarters*

Sliwinski further argues that Gunn conducted an illegal search of his private quarters at the rectory without his consent. In my view, however, the circumstances here—unlike those related to the car search—establish that an objectively reasonable officer could have believed that Sliwinski consented (whether wisely or unwisely) to this search of his living quarters. By Sliwinski's account, it is true that Gunn said that the police needed to search the home, and there was no straightforward request for consent. But his exchange with Gunn is far more ambiguous than his alleged exchange with respect to the search of the car. Sliwinski told Gunn that he had nothing to hide, did not otherwise object, and accompanied the troopers during their search. While it may be a close question whether Sliwinski actually consented, I have little difficulty concluding that an objectively reasonable police officer could have understood Sliwinski's response to amount to consent. *See, e.g.*, *United States v. Asibor*, 109 F.3d 1023, 1039 n. 16 (5th Cir. 1997) (statement that defendant had nothing to hide constituted consent to a search under the

---

[6] The identity of the officer who questioned and detained Jednaki remains unclear from the record. There is enough evidence of record for a jury to conclude that it could have been either Gunn or Pederson. Jednaki could not recall which officer questioned and handcuffed him, while Pederson stated in an affidavit that he was not sure but believed that Gunn had questioned Jednaki. In the meantime, Gunn stated in his affidavit that he instructed Pederson to interview Jednaki, and Sliwinski attested that Gunn was with him the whole time. Because I conclude as explained above that the temporary handcuffing of Jednaki was not *independently* a violation of clearly established law under the Fourth Amendment, this conclusion disposes of any remaining claim against Pederson. But it does not absolve Gunn of liability because of Gunn's initiation of an unlawful entry that proximately led to the questioning and handcuffing of Sliwinski and Jednaki. Because there is no evidence that Pederson was aware of or took part in Gunn's initially unlawful entry to the rectory or that he had reason to know that it was unlawful for the police to be inside the rectory, Pederson is entitled at the least to qualified immunity from plaintiffs' claims.

Fourth Amendment); *United States v. Jones*, 154 F. Supp. 2d 617, 620-22 (S.D.N.Y. 2001) (same).

### Claims against Defendants Burns, Morello, and Reid

In addition to Troopers Gunn and Pederson, plaintiffs also bring claims against Sergeant Burns and Troopers Morello and Reid. At oral argument, plaintiff's counsel stated the factual basis for these claims as follows: Burns knew what the witness had told troopers on the scene and directed Gunn and the other troopers to go to the church in the first place, and later directed the troopers to search the house. Reid participated in the search of the rectory with Gunn and Pederson. Morello, who never went to the rectory, interviewed witnesses at the scene of the armed robbery and related that information to the officers, which led them to go to the church.

It is clear that the remaining named police defendants—Burns, Morello, and Reid—are at the least entitled to qualified immunity. As to Burns, plaintiffs claim that he, as a supervisor, directed the other troopers at the scene. But there is no evidence that Burns instructed any of the troopers to take any actions that any objectively reasonable law enforcement officer would have have believed to be unlawful. For example, to the extent that he was aware of or directed Gunn's activities at the rectory, there is no evidence that he told Gunn to do anything that intruded on plaintiffs' Fourth Amendment interests without their consent or otherwise in violation of the law.

The same holds equally true for Reid and Morello (who was not even present at the rectory). There is no evidence of their participation in any activity that an objectively reasonable law enforcement officer would have known to be unlawful. Accordingly, I will grant summary judgment for Burns, Reid, and Morello, and all claims against them will be dismissed.

CONCLUSION

For the reasons set forth above, the motion for summary judgment by the state police officer defendants (Doc. #55) is GRANTED in part and DENIED in part. Summary judgment is GRANTED as to defendants Sergeant Burns and Troopers Pederson, Reid, Morello and John Doe Troopers #1 to #4. Summary judgment is DENIED as to Trooper Gunn because a genuine issue of fact remains concerning the lawfulness of and his entitlement to qualified immunity for his initial entry into the rectory and, in the alternative, with respect to his search of Sliwinski's car. Further facts as developed and found by the jury at trial may warrant a grant of qualified immunity for Gunn with respect to these claims. The motion for summary judgment by the City of Middletown and all of the John Doe Middletown police officers (Doc. #58) is GRANTED by concession and agreement of plaintiffs.

It is so ordered.

Dated at New Haven this 29th day of May 2015.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

18